**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LAUREL HILBERT,<br>2039 New Hampshire Avenue, N.W.<br>Washington, D.C. 20009 | **Case No. 1:24-cv-00584-RBW** |
| *Plaintiff,* | |
| v. | **Class Action Complaint** |
| UBER TECHNOLOGIES, INC.<br>1515 3rd Street<br>San Francisco, CA 94158 | **Jury Trial Demand** |
| RASIER, LLC<br>1515 3rd Street<br>San Francisco, CA 94158 | |
| DRINNEN, LLC<br>1515 3rd Street<br>San Francisco, CA 94158 | |
| SERVE (AS TO ALL): | |
| CT CORPORATION SYSTEM, Registered Agent<br>1015 15th Street NW<br>Suite 1000<br>Washington, DC 20005 | |
| *Defendants.* | |

## AMENDED NATIONWIDE CLASS ACTION COMPLAINT

## INTRODUCTION

1.      Plaintiff, Mr. Laurel Hilbert asserts the following claims against Defendants UBER
        TECHNOLOGIES, INC., RASIER, LLC, and DRINNEN, LLC (collectively, "Uber" or
        "Defendant") as follows:

1

2.      The revolutionary and disruptive new industry known as "ride-sharing" has provided new freedom of travel for many people in Washington, D.C. and elsewhere.  It permits them to use their smartphones to secure rides more swiftly, reliably, and conveniently – and then ride more cheaply – than was possible with taxi service alone.  However, users who are dependent on service animals have been denied these benefits because Defendants Uber Technologies Inc., Rasier LLC, and Drinnen LLC (collectively "Uber") have chosen not to adequately train their employed drivers on how to facilitate such users in Uber's growing fleet.

3.      Plaintiff Laurel Hilbert brings this action against Defendants under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA"), and the District of Columbia Human Rights Act, D.C. Code § 2-1401.0 *et seq*., for denying users who are dependent on service animals full and equal enjoyment of Defendants' transportation service.

4.      Mr. Hilbert has advocated for blind individuals his entire life and long before filing a lawsuit.

5.      The injunctive relief that Mr. Hilbert seeks will inure to the benefit of an estimated 2.3 percent of the United States population who reports having a visual disability,[1] and to Defendants, who will extend its market reach to this population.

6.      For this significant portion of Americans, accessing transportation services has become a necessity, not a convenience.

---

[1]      Erickson, W., Lee, C., von Schrader, S., *Disability Statistics from the American Community Survey (ACS)*, Cornell University Yang-Tan Institute (YTI), www.disabilitystatistics.org (last accessed June 14, 2023).

7.      Uber is at the forefront of a watershed change in transportation services, providing a highly convenient service to millions of riders: the ability to arrange cheap, door-to-door transportation with just a few minutes' notice.   Uber's ride-hailing service generates billions of dollars in revenue annually for the company.

8.      Uber has operated in the District of Columbia metropolitan area since 2011 and has rapidly expanded its base of users and drivers in the area.   Uber represents that at any time of day, a person in any neighborhood in the D.C. area can use Uber's smartphone application to connect with a vehicle in Uber's fleet.   That vehicle generally will arrive quickly and will take the person to any other location in the metropolitan area at a pre-determined price that is typically cheaper than the same ride taken with traditional taxicab or limousine services.

9.      Defendants provide a smartphone application that allows users to hire a private vehicle for transportation in any region in which Uber operates.   As Uber describes its service: "Tap a button, get a ride."

10.    To use Uber, an individual downloads the application on his or her smartphone, creates an account, and provides Uber with his or her phone number and credit card information.

11.    Once these preliminary steps are taken, the user may submit ride requests, which include both pick-up and destination locations, and can be for the user and any accompanying passengers. Upon receiving a request, Uber's system determines which nearby drivers will have the opportunity to respond and directs the request to them. After a driver accepts the trip request, Uber notifies the user of the driver's name, phone number, vehicle make and model, license plate number, estimated time of arrival, and customer satisfaction rating. Through a map on the application, the user can track the vehicle as it travels to pick up the user.

3

12.   At the trip's conclusion, Uber automatically processes payment with the user's credit card information. Uber collects the customer's fare directly, keeps between approximately 20% and 25% for itself, and remits the remainder of the fare to the Driver. Uber provides the user an electronic receipt and an opportunity to rate the Driver.

13.   Were Uber to provide similar service to service animal users, Uber's transportation services could have life-changing effects for such users, improving their ability to work, study, participate in community life, and generally to live more independently.

14.   Uber has prescribed and implemented a Service Animal and Assistive Device Policy, last modified on October 31, 2022.[2]  This policy, on its surface, effectively ensures that service animal users are not impeded in any way from full transportation service and amenities from Uber drivers.

15.   Despite this written policy, Uber does not properly train its employed drivers to uphold this policy and refuses to do so, whether on a regular basis or otherwise.

16.   Consequently, service animal users like Mr. Hilbert do not benefit from Uber's Service Animal and Assistive Device Policy because many drivers behave in flagrant disregard of that policy.

17.   Based on a 2018 report, over forty (40) million people in the United States were documented with a disability, including over seven and a half (7.5) million individuals who have a visual disability.[3]  According to the National Federation of the Blind's 2016 report

---

[2]     https://www.uber.com/legal/en/document/?name=service-animal-policy&country=united -states&lang=en.

[3]     Lee W. Erickson & S. von Schrader, *2018 Disability Status Report: United States*, CORNELL UNIVERSITY 10 (2020), https://www.disabilitystatistics.org/StatusReports/2018-PDF/2018-StatusReport_US.pdf (last visited April 1, 2024).  The report uses data from the 2018 American Community Survey.

(updated in 2019), approximately 16,400 visually impaired persons lived in the District of Columbia.[4] As a result of this, the probability that such persons may seek Uber's services within the District of Columbia is high.

18.     "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination."[5] "It was called the '20th Century Emancipation Proclamation for all persons with disabilities.'"[6] "Title III of the ADA contained broad language covering numerous public accommodations; both new construction and existing facilities were required by the statute to remove barriers to access. The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose."[7]

19.     "However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[8]

---

[4]     Blindness Statistics, National Federation of the Blind (updated January 2019) https://nfb.org/resources/blindness-statistics (last visited November 18, 2023).

[5]     Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009),  http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6  (last accessed June 14, 2022) (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990)).

[6]     *Id.* (*quoting* D. Russell Hymas & Brett R. Parkinson, Comment, *Architectural Barriers Under the ADA: An Answer to the Judiciary's Struggle with Technical Non-Compliance*, 39 Cal. W. L. Rev. 349, 350 (2003), https://scholarlycommons.law.cwsl.edu/cgi/viewcontent.cgi?article= 1166&context =cwlr; *see also* 136 Cong. Rec. 17,369 (1990) (statement of Sen. Tom Harkin) (discussing how facilities have failed to comply with the ADA by not removing barriers that impede access).

[7]     Johnson, *supra* note 5 (*citing* Elizabeth Keadle Markey, Note, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002), https://ir.lawnet.fordham.edu/flr/vol71/iss1/4 (last accessed June 14, 2023) (arguing for a more lenient standard for standing under the ADA)).

[8]     Johnson, *supra* note 5 (*citing* Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006), https://www.uclalawreview.org/the-perversity-of-limited-civil-rights-remedies-the-case-of-abusive-ada-litigation/ (discussing the need for private enforcement in Title III of the ADA and the fact that the limitations courts are placing on ADA plaintiffs are causing abusive litigation)).

20.     Thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[9] and private individuals[10] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[11]

21.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[12] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[13]

22.     Plaintiff brings this civil rights action against Defendant for its failure to properly impress upon its employed drivers (hereinafter "Drivers") the significance and critical aspects of their Service Animal and Assistive Device Policy (hereinafter "Policy"), and to properly train them on how to implement the Policy.

23.     Plaintiff uses the terms "blind" or "visually impaired" interchangeably to refer to all people with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200.

24.     Uber has the ability to make its D.C. fleet accessible to visually impaired users, but it chooses not to do so by, among other ways, failing to implement a comprehensive regular training program to clearly set forth the legal requirements to serve visually impaired

---

[9]     42 U.S.C. § 12188(b).
[10]    42 U.S.C. § 12188(a).
[11]    *See* Johnson, *supra* note 5.
[12]    *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).
[13]    *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007));
*D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008) (same).

patrons with service animals.

25.   Uber exercises considerable control over the vehicles used by its drivers, including by mandating the approved models and other specifications of Uber vehicles, and by helping drivers acquire inaccessible, Uber-approved vehicles in a variety of ways, including specialized leasing and rental programs.

26.   Uber also provides financial incentives for drivers to meet customers in a variety of ways, with respect to the cars they acquire, the hours they work, the areas where they drive, and more.

27.   Rather than try to do the same to properly train its employed Drivers and properly implement the Policy, Defendant recalcitrantly maintains that its Drivers are not its "employees." Defendant therefore contends that there is no fiduciary duty upon it to train its employed Drivers in this way.

28.   In addition, Defendant's violation of the ADA and the DCHRA subjects it to liability under the D.C. Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et. seq.* In particular, Defendant's practices, including but not limited to representing that its services are ADA-compliant and accessible, are non-compliant and inaccessible to blind and visually impaired persons, and anyone using service animals. D.C. Code § 28-3904(a), (b), (d), (h).

29.   Mr. Hilbert brings this lawsuit to remedy these ongoing injuries to himself and others similarly situated who use service animals. Among other things, Mr. Hilbert seeks an injunction that would require the Defendant to properly train its employed Drivers on the significance of the Policy, including but not limited to training videos, training at regular and repeated intervals, which are not less than twice per year, and verifications and/or certifications signed by employed Drivers after each such training that they will fully

adhere to the Policy and never reject a visually impaired patron in whole or in part because he or she has a service animal with them, and to implement the Policy with efficacy, as well as monetary and other equitable relief.

30.    Defendants are violating basic equal access requirements under both the ADA and state law by failing to implement policies and procedures that would prevent or reduce discrimination against blind riders committed by Defendants' Drivers. Because Defendants closely monitors and tightly control interactions between Uber Drivers and its customers, Defendants can adopt and enforce policies and procedures that would prevent or reduce discrimination against blind individuals with service animals, including members of Plaintiff's class. These policies would include, but are not limited to, the following:

a.    Provide an accessible method for blind individuals with service dogs to immediately and efficiently report instances where Uber Drivers refuse to transport them on the basis of disability;

b.    Establish a procedure for quickly investigating complaints and informing such blind persons of the outcome of their complaints;

c.    Provide mandatory periodic training to Uber Drivers and Helpline staff, but not less than two (2) times per year, concerning legal access requirements applicable to persons with service animals and explain to Drivers Helpline staff the consequences for failing to comply with these legal obligations;

d.    Require Drivers to sign certifications and/or verifications that they understand Defendants' Policy regarding service animals and the requirement that Drivers not decline rides to visually impaired or other persons who are lawfully eligible to use service animals;

8

e.  Meaningfully discipline Drivers who deny access to blind riders with service animals and permanently terminate Drivers who violate service animal policies on the first occasion; and

f.  Randomly deploy blind testers who use service dogs to proactively identify – for retraining or termination – Drivers who refuse to transport individuals with disabilities because of the presence of their service animals.

## PARTIES

31.  Plaintiff Laurel Hilbert ("Plaintiff" or "Mr. Hilbert") resides in Washington, D.C.

32.  Plaintiff is a blind, visually-impaired handicapped person and a member of a protected class of individuals under the Americans with Disabilities Act ("ADA"), pursuant to 42 U.S.C. §§ 12102(1)-(2), and the regulations implementing the ADA set forth at 28 C.F.R § 36.101 *et seq.*, and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq.*

33.  Because he is visually impaired, he is a frequent consumer of ride-share services, and it is inevitable that Uber's discriminatory denial of services, as well as its failure to train its Drivers on the use of service animals by consumers, will injure him again if these discriminatory actions are not remediated in accordance with the Americans with Disabilities Act and DCHRA requirements.

34.  Defendant Uber Technologies, Inc. is and was at all relevant times incorporated in Delaware and headquartered in California.  It does business in the District of Columbia. Its ride-share services are offered to the general public and constitute a public accommodation within the definition of the ADA, 42 U.S.C. § 12181(7) and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq.*, and a "good or service" within

the meaning of the DC Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et. seq.*

35. Defendant Rasier, LLC, is a subsidiary of Uber Technologies. It is a Delaware corporation with headquarters in California. It holds many of the licenses required for Uber's operations. In particular, Rasier is a licensed, private sedan business in the District of Columbia.

36. Defendant Drinnen, LLC, is a subsidiary of Uber Technologies. It is a Delaware corporation with headquarters in California. It holds a permit to operate as a digital dispatch company in the District of Columbia.

37. Defendants Uber, Rasier and Drinnen are collectively referred to as "Defendants".

## JURISDICTION AND VENUE

38. This Court has subject-matter jurisdiction over this action under 28 U.S.C § 1331 and 42 U.S.C. § 12181 as Plaintiff's claims arise under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.* and 28 U.S.C. § 1332.

39. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims under the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq.* and the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq.* ("CPPA").

40. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant conducts and continues to conduct a substantial and significant amount of business in the District of Columbia.

41. Defendants are subject to personal jurisdiction in this District. Defendants have been and are committing the acts or omissions alleged herein in this District that have caused some of the injuries and violated the rights of Plaintiff and other customers who are eligible to

use and, in fact, use service animals in this District under the ADA, the DCHRA, and the CPPA. A substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

42.   In particular, Plaintiff has on many occasions been denied the full use and enjoyment of Uber's services and amenities offered to the general public, including on at least one occasion almost being physically harmed. Plaintiff lost many opportunities to use Uber services and amenities due to the discriminatory roadblocks faced as a result of Defendants' failure to properly train its Drivers to implement the Policy.

43.   Further, these access barriers that Plaintiff encountered have caused a denial of his full and equal access multiple times in the past, and now deters him on a regular basis from accessing an Uber vehicle in the future, which is antithetical to the freedoms promised to the visually impaired by the passage of federal and state disability civil rights legislation.

44.   The inaccessibility of Uber's transportation services has prevented, and continues to prevent, visually impaired users with service animals from becoming fully integrated into society. As a House Committee report on the bill that would become the ADA aptly put it: "Transportation is the linchpin which enables people with disabilities to be integrated and mainstreamed into society." H.R. Rep. 101- 485(II) at 37 (1990). Without reliable transportation options, visually impaired people cannot maintain employment, obtain healthcare, visit family and friends, or otherwise be full and regular participants in civic life.

45.   Uber has approximately 30,000 drivers in the D.C. area operating approximately 30,000 different vehicles to provide a variety of transportation options, including basic, luxury, oversize, carpool, and other services based on customer preference.

46.   Uber regularly characterizes itself as simply a conduit between riders and drivers who happen to use certain cars, suggesting that the composition of its fleet is beyond its control.

47.   This is not true. Through its practices and policies, Uber exercises substantial control over the vehicles that make up its fleet, including dictating which car models will be used and deciding how much financial assistance to provide drivers in acquiring them. Indeed, with respect to the next generation of Uber's fleet, it has begun purchasing cars itself.

48.   Uber has otherwise moved aggressively to fully satisfy customer demand in D.C. It does so by offering a variety of options at different price points and investing heavily to put more cars and more varied options on the road.

49.   For instance, in response to user demand, Uber devised a ride pricing system to incentivize the availability of larger vehicles and luxury vehicles. Recently, it has offered incentives to other drivers to make car seats available for users traveling with small children. It also has rolled out a carpool option for users who prefer even cheaper fares and who do not mind slightly longer rides.

50.   Uber even advertises its services to people with certain kinds of disabilities, including those with visual impairments. Uber emphasizes that individuals with vision impairments can use Uber and will "no longer have to prearrange rides through a dispatcher or resort to other, less convenient, means of hailing a ride."

51.   On its website, Uber advertises that users can request rides "24 hours a day, 7 days a week." Uber thus holds out as an essential element of its service that rides will always be available.

52.   This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, and to issue injunctive relief to make those persons who have been discriminated

against "whole" by, among other ways, implementing programs and compelling Defendants to take other actions to remediate their discriminatory behavior and actions.

## **FACTUAL BACKGROUND**

53.    Mr. Hilbert has regularly requested Drivers through Uber.

54.    On multiple occasions, Drivers have pulled up to the pick-up location and, upon seeing Mr. Hilbert and/or his service animal, have refused to provide services to him, either by overtly refusing to allow him to enter their cars, locking the doors, or simply driving away, leaving Mr. Hilbert stranded.

55.    On one occasion on or about May 29, 2023, Mr. Hilbert was at Best Buy in Arlington, Virginia.  He requested an Uber to travel to his home in Washington D.C., and asked a pedestrian to direct him to the car.  After he got to the car, the Driver locked the door and told him that he would not take him because he has a dog! Mr. Hilbert explained to him that it is a service dog, and that he is blind.  The Driver immediately drove away while his hand was on the handle.  As a result, he was dragged with the car and fell on the pavement with his dog.   This was a traumatic experience for him, leaving him on edge, losing sleep and anxious for the next potential Uber ride. .

56.    On other occasions, when Mr. Hilbert has noted through Uber's messaging application that he is visually-impaired and travels with the assistance of a service dog, Drivers for Uber have canceled previously scheduled trips.

57.    On a number of occasions, Drivers for Uber have refused to drive Mr. Hilbert even after he *explained* that his dog is a service dog whose presence is necessary to assist him because he is visually impaired.

58.    On or about April 17, 2023, Mr. Hilbert requested an Uber.  As the Uber approached him

to pick him up, it did not stop but drove away.  Mr. Hilbert contacted Defendants' Safety

line.

59.    On or about June 15, 2023, on two separate occasions, Mr. Hilbert requested an Uber pick

up.  He was notified that the Uber Driver was arriving, but the Driver just drove on by

without picking up Mr. Hilbert and his service dog.

60.    For example, on or about August 6, 2023, Mr. Hilbert requested an Uber and when it

arrived, he quickly got into the vehicle with his service dog.  The Driver stated that he did

not want to take them because of the dog.  Mr. Hilbert informed him that he did not have

a choice and that he agreed to the Uber terms of service and conditions as it relates to

service animals.  After a heated discussion, the Driver finally relented and decided to drive

Mr. Hilbert because he refused to leave the vehicle.

61.    On or about August 14, 2023, Mr. Hilbert contacted Metro Access paratransit service,

and they arranged for an Uber to pick him up for his commute to work. As soon as

he received the trip confirmation, he took a screenshot of the trip details, as he has

had previous experiences with Uber Drivers refusing his trips due to the fact that he

has a service dog.  Unfortunately, this morning's encounter would turn out to be

another distressing incident.

62.    When the Uber Driver arrived, Mr. Hilbert approached the vehicle with his service

dog. However, the Driver proceeded to tell him that he would not take him because

of his dog. Mr. Hilbert promptly informed him that he did not have a choice in the

matter, as his dog is a service dog and is protected by law to accompany him. Mr.

14

Hilbert proceeded to open the car door, allowing his dog to get in, while the driver started to back up the vehicle, with Mr. Hilbert still holding onto the car door. He swiftly managed to jump into the car.

63.   The Driver began to insist that he had canceled the trip and instructed Mr. Hilbert to leave the vehicle. Mr. Hilbert refused his request, and in response, Mr. Hilbert told him to call the police, presumably to address the situation. Mr. Hilbert took immediate action and called the Uber Helpline to explain the unfolding incident. He requested the representative to stay on the line with him to clarify Uber's Policy regarding service animals when the police arrive.

64.   Soon after, the police arrived at the scene. Mr. Hilbert requested a detailed report of the entire incident, and he informed them that an Uber representative was currently on the line with him, capable of explaining Uber's Service Animal Policy. The police raised a question about whether a driver, especially if the vehicle was their personal one, had the right to refuse a ride to someone with a service animal according to Uber's Policy. To Mr. Hilbert's disbelief, the Uber representative stated that the Driver indeed had the right to refuse such a ride, which contradicted both federal and state laws protecting the disabled as well as Uber's own "Policy."

65.   Despite Defendants' representative's apparently ignorant response, Mr. Hilbert firmly disagreed with both him and the police officers. Eventually, the police provided him with an incident report. Mr. Hilbert then contacted Metro Access to arrange an alternative ride to get him to work. He was panicked and very

distressed.  This unpleasant and discriminatory encounter made Mr. Hilbert late for work and had a significant negative impact on his mental state.

66.     On or about August 24, 2023, Mr. Hilbert was again denied an Uber ride by a Driver who drove off without picking him up after apparently observing Mr. Hilbert with his service dog (Mr. Hilbert has audio that will advise when the Uber vehicle is approaching).  Mr. Hilbert was on his way to the airport to fly out of town.

67.     The following day while at his out-of-town destination, another Uber Driver approached Mr. Hilbert but did not stop.  Mr. Hilbert had a service animal with him again.  Two days later, on or about August 27, 2023, the same thing happened again, when an Uber Driver who was requested for pick up did not stop to pick up Mr. Hilbert and his dog.

68.     On or about September 26, 2023, Mr. Hilbert was again the victim of an Uber Driver driving up to only drive away once it was clear that he had a service animal with him.

69.     On or about October 13, 2023, Mr. Hilbert was again denied service by an Uber Driver because he was accompanied by his service animal.

70.     Mr. Hilbert has reported refusals by Uber Drivers to serve him (and his service dog) to Defendants' "safety line" on a number of occasions without any effective response.

71.     Typically, the only response that Mr. Hilbert receives from Defendants  is an apology and crediting of the cost of the trip.

72.     After the August 24-27 encounters, Defendants simply responded:

> Hi Laurel,
> Thanks for following up. We understand you'd like to know more about the outcome of our investigation around your reported trips between August 24 and August 27.
> While we can no longer share further details about the investigation due to our Privacy Notice, we can assure you that we've thoroughly reviewed this report and have taken appropriate action on your case pursuant to our policies.

You can learn more about this matter by checking out Uber's Community
Guidelines and Uber's Service Animal and Assistive Device Policy.  We
appreciate your understanding, and please reach out if you have any
other questions - we are here to help.

73.    This response from Defendants is its standard response, providing Mr. Hilbert with no

information to ensure that these discriminatory episodes will not be repeated and to convey

what steps Defendants are taken to globally address this problem of its Drivers refusing to

drive Mr. Hilberts (and others similarly situated) simply because they are accompanied by

a service animal.

74.    Defendants have asserted that they have a "zero tolerance" or "one strike" rule to expel a

Driver permanently from driving for Defendants, if they refuse to pick up a visually

impaired passenger who has a service animal in his or her presence.

75.    Nonetheless, due to Defendants' failure, among other ways, to properly communicate that

rule and to properly educate and seek signed certifications from Drivers that they will

adhere to Defendants' Policy, Drivers repeatedly to this day continue to refuse to pick up

visually impaired passengers, including Mr. Hilbert, causing them emotional and other

damages.

76.    Unlike other ride share services, Uber does not maintain a dedicated phone number or

service where disabled consumers can report failures by Drivers to serve consumers who

require the assistance of service animals.

77.    On or about May 30, 2023, Plaintiff wrote to Defendants to notify them about the unlawful

discrimination in the provision of Uber services to blind individuals with service animals.

The parties engaged in discussions an in effort to resolve the issue without a lawsuit. On

or about September 28, 2023, Defendants rejected Plaintiff's proposal for injunctive

measures to remediate the disability discrimination problems. Defendants have since then

failed to take adequate measures to remedy the discrimination, and Defendants' Drivers continue to discriminate against blind customers with service animals.

## **CLASS ALLEGATIONS**

78.    Mr. Hilbert brings this class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) on behalf of himself and the following nationwide class: all blind or visually disabled individuals who use service animals and who have attempted to access or been deterred from attempting to access or from accessing Uber transportation services in whole or in part because they use a service animal.

79.    <u>Numerosity</u>: The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective class members through this class action will benefit both the parties and this Court, and will facilitate judicial economy.

80.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of the members of the class. The claims of Plaintiff and members of the class are based on the same legal theories and arise from the same unlawful conduct.

81.    <u>Common Questions of Fact and Law</u>: There is a well-defined community of interest and common questions of fact and law affecting members of the class in that they all have been, are being, and/or will be denied their civil rights to full and equal access, and use and enjoyment of Defendants transportation services to Defendants' failure to make their services fully accessible to visdually impaired or other persons who use service animals as described herein.

82.    <u>Adequacy of Representation</u>: Plaintiff is an adequate representative of the class because his interests do not conflict with the interests of the members of the class. Plaintiff will

fairly, adequately, and vigorously represent and protect the interests of the members of the class, and he has no interests antagonistic to the members of the class. Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation, generally, and who possess specific expertise in the context of ADA litigation.

83.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, making appropriate both declaratory and injunctive relief with respect to Plaintiff and the class as a whole.

**FIRST CAUSE OF ACTION**
**<u>Violation of the Americans with Disabilities Act</u>**
**(42 U.S.C. § 12181 et seq.)**

84.   Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

85.   Section 302(a) of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

86.   Title III of the Americans with Disabilities Act prohibits discrimination on the basis of disability by owners, operators, lessees, and lessors of places of public accommodation. 42 U.S.C. § 12182(a).

87.   Title III of the ADA also prohibits discrimination on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity

that is primarily engaged in the business of transporting people and whose operations affect commerce. 42 U.S.C. § 12184(a); 49 C.F.R. § 37.5(a), (f).

88.   Defendants' ride-share service is a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

89.   The ride-share service is a service offered to the general public and, as such, must be equally accessible to all potential consumers.

90.   Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodations of an entity, which is equal to the opportunities afforded to other individuals.  42 U.S.C. § 12182(b)(1)(A)(ii).

91.   Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. §§ 12182(b)(2)(A)(ii) – (iii).

92.   The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder.

93.   Plaintiff, who is a member of a protected class of persons under the ADA, has a physical disability that substantially limits the major life activity of sight within the meaning of 42 U.S.C. §§ 12102(1)(A) – (2)(A).

94.   Defendants own, operate, or lease vehicles providing taxi service and specified public transportation within the meaning of Title III of the ADA and its regulations. 49 C.F.R. §§ 37.3, 37.29, App. D § 37.29. The vehicles providing taxi services owned, operated, or leased by Defendants are places of public accommodation within the meaning of Title III of the ADA. 42 U.S.C. §§ 12181(10), 12184(a); 28 C.F.R. § 36.104. Except for modifications to vehicles providing taxi services for the purpose of wheelchair accessibility, all of the antidiscrimination provisions of Title III of the ADA apply to the goods, services, facilities, privileges, advantages, and accommodations of vehicles providing taxi services.

95.   Title III prohibits public accommodations from excluding, on the basis of disability, individuals with disabilities from participating in or benefiting from the goods, services, facilities, privileges, advantages, or accommodations of public accommodations or otherwise discriminating against a person on the basis of disability. 42 U.S.C. § 12182(b)(1)(A)(i); 28 C.F.R. § 36.202(a).

96.   By failing to adopt policies and practices that will prevent or reduce discrimination against blind individuals with service animals in the provision of Defendants' taxi service, Defendants violate Title III of the ADA by excluding Plaintiffs on the basis of disability from enjoying the services, privileges, advantages, or accommodations of Uber vehicles.

97.   Under Title III, it is also unlawful for places of public accommodation to afford, on the basis of disability, an individual or class of individuals with disabilities with an opportunity

to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii); 28 C.F.R. § 36.202(b).

98. Defendants violate Title III of the ADA by providing blind individuals with service animals, including Plaintiff, an opportunity to participate in or benefit from the services, privileges, advantages, or accommodations of Uber vehicles that is not equal to that afforded other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii); 28 C.F.R. § 36.202(b).

99. Title III further prohibits places of public accommodation from providing, on the basis of disability, an individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals. 42 U.S.C. § 12182(b)(1)(A)(iii); 28 C.F.R. § 36.202(c).

100. By operating a taxi service that dispatches drivers who unlawfully discriminate against and refuse to transport blind individuals with service animals, Defendants violate Title III of the ADA because it provides Plaintiff and those similarly situated, on the basis of disability, with services, privileges, advantages, and accommodations of Uber vehicles that are different or separate from that provided to other individuals. 42 U.S.C. § 12182(b)(1)(A)(iii); 28 C.F.R. § 36.202(c).

101. Title III prohibits private entities providing specified public transportation from imposing eligibility criteria that screen out or tend to screen out individuals with disabilities from fully enjoying the specified public transportation services provided by the entity, unless such criteria can be shown to be necessary for the provision of the services being offered. 42 U.S.C. § 12184(b)(1); 28 C.F.R. § 36.302(a).

102. By operating a taxi service that dispatches drivers who unlawfully discriminate and refuse to transport blind individuals with service animals, Defendants violate Title III of the ADA because Defendant is utilizing eligibility criteria that screen out or tend to screen out Plaintiffs and other blind individuals with service dogs from fully enjoying the Uber taxi service. 42 U.S.C. § 12184(b)(1); 28 C.F.R. § 36.302(a).

103. It is a violation of Title III for public accommodations to fail to make reasonable modifications in policies, practices, or procedures when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. §§ 12182(b)(2)(a)(ii), 12184(b)(2)(A); 49 C.F.R. § 37.5(f); 28 C.F.R. § 36.302(a).

104. By failing to modify practices, policies, and procedures to ensure that drivers of Uber vehicles are properly trained and do not refuse to transport blind individuals with service animals, Defendant is denying Plaintiffs full and equal access to Uber's taxi services.

105. In addition, it is a violation of Title III to utilize, directly or through contractual or other arrangements, standards or criteria or methods of administration that have the effect of discriminating on the basis of disability. 42 U.S.C. § 12182(b)(1)(d); 28 C.F.R. § 36.204.

106. By administering Defendant's Uber taxi service in a manner that results in blind individuals who use service animals being denied access to the Uber service on the basis of disability, Defendants are denying Plaintiff and those similarly situated full and equal access to the services, privileges, advantages, and accommodations of Uber vehicles because Defendant

is utilizing methods of administration that have the effect of discriminating on the basis of disability.

107.   Title III regulations prohibit private entities providing taxi services from discriminating by refusing to provide taxi services to people with disabilities who can physically access taxi vehicles. 42 U.S.C. § 12184(b)(4)(B); 49 C.F.R. §§ 37.5(a)-(b), (f), 37.29(c).

108.   Title III regulations also specifically require that private entities providing transportation services permit service animals to accompany people with disabilities in vehicles and facilities. 49 C.F.R. §§ 37.5(f), 37.37(f), 37.167(a), (d); 28 C.F.R. § 302(c)(1).

109.   Defendant violates Title III of the ADA by refusing to provide transportation services to blind individuals with service animals, including Plaintiff and those situated situated, who can physically access Uber vehicles. Defendant therefore violates Title III of the ADA by denying Plaintiff and those similarly situated full and equal access to the services, facilities, privileges, advantages, and accommodations of vehicles providing the Uber taxi service.

110.   The actions of Defendants were and are in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12181, *et seq.*, and regulations promulgated thereunder. Defendants have failed to take any equitable steps to remedy their discriminatory conduct, and Defendants' violations of the ADA are ongoing. Defendants' unlawful actions deter members of Plaintiff's class, including Plaintiff Laurel Hilbert, from attempting to access the Uber taxi service. Unless the Court enjoins Defendants from continuing to engage in these unlawful practices, Plaintiff will continue to suffer irreparable harm.

111.   Plaintiffs are entitled to injunctive relief. 42 U.S.C. § 12188.

112.   WHEREFORE, under 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

## SECOND CAUSE OF ACTION
## <u>Violation of the DC Human Rights Act</u>
### (D.C. Code §§ 2-1401, et seq.)

113.   Plaintiff repeats and realleges every allegation of the preceding paragraphs as if fully set
       forth herein.

114.   The DCHRA makes it "… an unlawful discriminatory practice to do any of the following
       acts, wholly or partially for a discriminatory reason based on the actual or perceived: …
       disability… of any individual: (1) To deny, directly or indirectly, any person the full and
       equal enjoyment of the goods, services, facilities, privileges, advantages, and
       accommodations of any place of public accommodations." D.C. Code § 1-1402.31(a)(1).
       Defendant is systematically violating the DCHRA.

115.   In addition, "Any practice which has the effect or consequence of violating any of the
       provisions of this chapter shall be deemed to be an unlawful discriminatory practice." D.C.
       Code § 1-1402.68.

116.   Defendants are a "place of public accommodation" within the meaning of the DCHRA
       because they are separately and collectively a "… person or place that provides, to a person
       in the District, access to an accommodation, service, or good, whether or not that person
       or place maintains a physical location in the District or charges for those goods or services,
       such as inns, taverns, road houses, hotels, motels, whether conducted for the entertainment
       of transient guests or for  the accommodation of those seeking health, recreation or rest,"
       which includes its physical facility and its goods and services offered to consumers in the
       District of Columbia through its ride-sharing service.

117.   Defendants' ride-share service is a service provided by Defendants that is inaccessible to
       patrons like Mr. Hilbert who are visually impaired. This inaccessibility has denied those

visually impaired full and equal access to the facilities and services Defendants make available to the non-disabled public. Defendants have violated the DCHRA by denying visually impaired customers the services and products it provides. These violations are ongoing.

118.  Defendant's actions constitute disability discrimination against Plaintiff and those similarly situated in violation of the DCHRA because Defendants' service is inaccessible to Plaintiff and the class, Defendants knowingly maintain their service in this inaccessible form, and have failed to take adequate actions to correct these discriminatory barriers even after being notified of the effects of that discrimination.

119.  Defendants' actions also constitute a discriminatory practice against Plaintiff and those similarly situated on the basis of disability in violation of the DCHRA because the ride-sharing service "… has the effect or consequence of violating any of the provisions of this chapter…." D.C. Code § 1-1402.68.

120.  Defendants are also violating the DCHRA because the conduct alleged herein likewise constitutes a violation of the various provisions under the ADA, 42 U.S.C. § 12101 et seq. Courts look to case law interpreting the Americans with Disabilities Act ("ADA") in construing comparable provisions of the DCHRA where no controlling precedent from the D.C. Court of Appeals exists. *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583-84 (D.C. 2001).

121.  Defendants' actions were and are in violation of the DCHRA and, therefore, Plaintiff and others similarly situated are entitled to injunctive relief remedying the discrimination.

122.  Plaintiff is also entitled to a preliminary and permanent injunction enjoining Defendants from violating the DCHRA and requiring Defendants to take the steps necessary to make

26

its ride-share service readily accessible to and usable by visually impaired individuals, as well as other forms of injunctive relief.

123. Defendants' denial of accessible services and their discrimination against Plaintiff renders them liable for each and every offense for the actual and special damages in an amount to be determined by a jury, and reasonable attorney's fees and costs that may be determined by the Court. D.C. Code § 2-1403.16.

**THIRD CAUSE OF ACTION**
**<u>Violation of the DC Consumer Protection Procedures Act</u>**
**(D.C. Code §§ 28-3901, *et seq.*)**

124. Plaintiff realleges and incorporates by reference the prior paragraphs as if fully set forth herein.

125. The D.C. Consumer Protection Procedures Act ("CPPA") is "construed and applied liberally" to protect a consumer's "right to truthful information about consumer goods and services" purchased or received in the District of Columbia. *Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999, 1004 (D.C. 2020) (*citing* D.C. Code § 28-3901(c); *see also* D.C. Code § 28-3905(k)(1)(A) (providing private right of action)).

126. Any person, whether acting for their self-interests or the general public, may bring an action under the CPPA to seek relief by any person of an unfair and/or unlawful trade practice in violation of D.C. law. D.C. Code § 28-3905 (k)(1) (2009).

127. While the CPPA enumerates a number of specific unlawful trade practices, the enumeration is not exclusive. *Dist. Cablevision Ltd. P'shp v. Bassin*, 828 A.2d 714, 723 (D.C. 2003).

128. Trade practices that violate other laws, including the common law, also fall within the purview of the CPPA. The CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices proscribed by D.C. Code § 28-3904, but to all other statutory

and common law prohibitions.  *Id*.; *Osbourne v. Capital City Mortg. Corp.*, 727 A.2d 322, 325-26 (D.C. 1999).  Prohibitions under the DCHRA, including disability discrimination are included prohibitions.

129.  CPPA violations occur when a person makes a representation that goods or services have characteristics or qualities that they do not have, D.C. Code § 28-3904(a); makes a representation that the person has a status that the person does not have, D.C. Code § 28-3904(b); makes a representation that goods or services are of particular standard or quality, if in fact they are of another, D.C. Code § 28-3904(d); and/or advertising services without the intent to sell them as advertised or offered, D.C. Code § 28-3904(h).

130.  The consumer also "need not prove that she was 'misled, deceived, or damaged' by a merchant's actions[,]" D.C. Code § 28-3904, nor "always prove that the merchant made an intentional misrepresentation under the CPPA." *Frankeny*, 225 A.3d at 1004.

131.  Under the CPPA, Plaintiff and those similarly situated are consumers of Defendants, a ride-share service.

132.  In addition, a reasonable person would find that the representation of accessibility to disabled consumers made by Defendants, or any of them, was a fact, when, in reality, it was not accessible to blind and visually impaired persons with service animals.

133.  The CPPA "affords a panoply of strong remedies, including treble damages, punitive damages, and attorneys' fees, to consumers who are victimized by unlawful trade practices." *Frankeny*, 225 A.3d at 1004 (*Ford v. Chartone, Inc.* 908 A.2d 72, 81 (D.C. 2006) (citation and internal quotation marks omitted).

134.    In addition to the direct damages suffered by Plaintiff for being denied promised services by Defendants as specified above, he seeks as damages in this action up to treble damages and attorneys' fees as a consumer for Defendant's unlawful trade practices.

135.    Corporate officers are personally liable when they participate in, inspire, or fail to prevent unlawful trade practices under the CPPA. *Cooper v. First Gov. Mortg. & Investors Corp.*, 206 F. Supp. 2d 33, 36 (D.D.C. 2002); *Lawlor v. District of Columbia*, 758 A.2d 964, 974 (D.C. 2000).

136.    Individual liability under the CPPA is appropriate where a corporate officer participates directly in the deceptive practices or had authority to control those practices and had or should have had knowledge of those practices. *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 498 (D.C. Cir. 2015).

137.    Defendants are liable for all damages suffered by Plaintiff under the CPPA, justifying an award of actual damages, up to treble damages, and attorneys' fees and litigation costs, in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### Declaratory Relief

138.    Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

139.    An actual controversy has arisen and now exists between the parties in that Plaintiff contends and is informed and believes that Defendants deny that they do not provide blind and/or visually impaired customers with service animals the full and equal access to its services and facilities, and/or fail to comply with applicable laws, including but not limited

to Title III of the Americans with Disabilities Act and the DCHRA, prohibiting discrimination against the blind and visually impaired.

140.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

## **PRAYER FOR RELIEF**

141.    WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

A.    For a judgment that Defendants, or any of them, violated Plaintiff's rights under the ADA, the DCHRA, and the CPPA;

B.    A declaration that Defendants, or any of them, own, maintain, and/or operate their ride-sharing service in a manner that discriminates against the blind and visually impaired persons, and which fails to provide access for persons with disabilities as required by the ADA and the DCHRA.

C.    A preliminary and permanent injunction prohibiting Defendants from violating the ADA and the DCHRA;

D.    A preliminary and permanent injunction requiring Defendants to take all steps necessary to make their ride-sharing service fully compliant with the requirements set forth in the ADA and its implementing regulations, so that the service is regularly accessible to and usable by blind and visually impaired individuals, including but not limited to:

i.    Regular training of Defendants Drivers, Helpline staff and any other employee who interacts with visually impaired persons in the legal requirements of the ADA, including pertaining to access for visually impaired persons with service animals to their transportation services;

30

ii.     Such trainings shall be conducted at least two times per year, and all attendees shall sign a certification that they attended such training, understand the content of the training and that they shall abide by the legal requirements to driver all patrons who are accompanied by service animals;

iii.    Disabled patrons shall have a designated Helpline phone number to contact for denial of services associated with service animals so that an Uber representative may intervene at the start of a ride trip, if necessary, to remind a Driver of the legal requirements to grant access to such persons with service animals and shall not refuse such ride share;

iv.     To the extent that a Helpline complaint is filed by a visually impaired person who was denied service due to a service animal, Defendants shall notify that person of the results of the investigation; and

v.      Defendants shall employ random testers to ensure that Drivers are adhering to legal requirements under the ADA and DCHRA.

E.     Economic and/or compensatory damages under the ADAD, DCHRA, and up to treble damages under the CPPA, as applicable, in an amount to be determined at trial;

F.     Pre- and post-judgment interest;

G.     An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

H.     Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated: Wednesday, April 10, 2024            Respectfully submitted,

**ERIC SIEGEL LAW, PLLC**

By    /s/ Eric L. Siegel
Eric L. Siegel (Bar No. 427350)
esiegel@ericsiegellaw.com
888 17th Street, N.W., Suite 1200
Washington, D.C. 20006
(202) 946-2962 (Main)
(771) 220-6116 (Direct)
(202) 223-6625 (Facsimile)

*Attorney for Plaintiff Laurel Hilbert*